1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Reyes LUNA,

            Plaintiff,

      v.

UNITED STATES OF AMERICA,

           Defendant.

Case No. 2:20-cv-1152

**COMPLAINT**

## <u>INTRODUCTION</u>

1.    This case concerns the unlawful detention and deportation of Plaintiff Reyes Luna (Mr. Luna), who Customs and Border Protection (CBP) agents removed to Mexico even though he was in ongoing removal proceedings. Mr. Luna was seeking protection against removal based on his fear of return to Mexico.

2.    While on a trip to southern Texas in October 2016, CBP agents detained Mr. Luna, refused to acknowledge the lawful identification he produced, ignored his pleas that he was in removal proceedings, and instead insisted that he agree to his own deportation.

3.    CBP agents then deported Mr. Luna despite knowing with absolute clarity that his removal proceedings were ongoing. Records obtained under the Freedom of Information Act (FOIA) reflect that agents queried Mr. Luna's immigration record, discovered he was in removal

1   proceedings, and still proceeded to remove Mr. Luna. Agents did so even though an asylum

2   officer with United States Citizenship and Immigration Services (USCIS) previously determined

3   that Mr. Luna had a significant possibility of demonstrating he had a reasonable fear of returning

4   to Mexico.

5       4.    Mr. Luna's immigration attorney notified Immigration and Customs Enforcement

6   (ICE) soon after Mr. Luna's removal that he had been unlawfully deported. Yet officials with the

7   Department of Homeland Security (DHS) did not authorize Mr. Luna's reentry to the United

8   States for two more months. During this time, Mr. Luna remained in hiding, fleeing the terrifying

9   circumstances which prompted him to seek protection in the United States in the first place. Soon

10   after being returned to Mexico, Mr. Luna's brother-in-law was tortured and killed. Mr. Luna

11   believes his brother-in-law was targeted because the persecutors were hunting down Mr. Luna.

12   Mr. Luna lived in constant fear that he also could be tortured and killed.

13       5.    Mr. Luna was ultimately paroled back into the country in January 2017.

14       6.    CBP's unlawful detention and deportation of Mr. Luna caused and continues to cause

15   Mr. Luna severe anxiety, depression, pecuniary loss, and trauma, among other damages.

16       7.    As a result of CBP's unlawful actions, Mr. Luna brings this action under the Federal

17   Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671-2680, to vindicate his rights.

18   **JURISDICTION**

19       8.    This court has jurisdiction over the subject matter of this complaint pursuant to 28

20   U.S.C. §§ 1131 (federal question statute) and 1346(b) (United States as defendant).

21   **EXHAUSTION**

22       9.    Pursuant to U.S.C. 28 § 1675(a), Mr. Luna submitted an administrative tort claim to

23   Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and the

24   Department of Homeland Security (DHS) on October 20, 2018.

COMPLAINT – 2
Case No. 2:20-cv-1152

1    10.    On March 3, 2020, Defendant CBP issued a a notice denying Mr. Luna's claim under

2    the FTCA. Plaintiff has thereby exhausted all administrative remedies and is filing this complaint

3    in accordance with the FTCA.

**VENUE**

4

5    11.    Venue in the District Court for the Western District of Washington is proper under 28

6    U.S.C. § 1402(b). Plaintiff resides in this judicial district.

**PARTIES**

7

8    12.    Plaintiff Reyes Luna is a resident of Bellingham, Washington.

9    13.    Defendant United States of America is the appropriate defendant for claims brought

10   pursuant to the FTCA. 28 U.S.C. § 1346(b).

**FACTUAL ALLEGATIONS**

11

12   **Mr. Luna's Immigration History**

13   14.    Mr. Luna has lived in the United States for over fifteen years. He was previously

14   removed from the country in 2001 and 2002, but reentered the country to escape violent drug-

15   trafficking groups that threatened him.

16   15.    In December 2014, Mr. Luna was arrested for a DUI. The Department of Homeland

17   Security (DHS) then detained Mr. Luna and moved to reinstate his prior removal order. During

18   this process, Mr. Luna expressed a fear of returning to Mexico.

19   16.    An asylum officer with USCIS then interviewed Mr. Luna, and determined that he

20   had a significant possibility of demonstrating a reasonable fear of returning to Mexico. As a

21   result, he was placed in withholding of removal proceedings before the immigration court, where

22   he requested withholding of removal and protection under the Convention Against Torture

23   (CAT).

24

COMPLAINT – 3
Case No. 2:20-cv-1152

17.     After six months in detention, Mr. Luna was given a bond hearing. The immigration judge (IJ) set a bond of $7,000, which Mr. Luna posted. He was subsequently released from detention.

18.     His case was then transferred to the non-detained docket before the immigration court in Seattle, Washington. At the time of his unlawful deportation in Texas, Mr. Luna was waiting for his next hearing before the immigration court, scheduled for June 2017.

**Unlawful Arrest in Hidalgo**

19.     In October 2016, while waiting for his next hearing, Mr. Luna travelled to Hidalgo, Texas to spend time with members of his family.

20.     One evening in late October, Mr. Luna attended a party with friends in Hidalgo, Texas. He did not consume alcohol that night. After a disagreement with the friends who were supposed to drive him back to his accommodations, he began to walk back instead.

21.     While walking, Mr. Luna began to follow a group of strangers, as he was not sure of the way back to town. CBP officers appeared and began to stop members of group he was following. Mr. Luna decided to keep walking, but the agents stopped him and asked for his identification.

22.     Mr. Luna produced his Washington state identification and paper documentation demonstrating that he was in ongoing withholding of removal proceedings. The CBP agent seized Mr. Luna's papers and arrested him in spite of the proof he offered of his ongoing immigration proceedings.

23.     The CBP agents took Mr. Luna to a detention facility. There, Mr. Luna told an agent that processed his arrest that the other agents had seized documentation of his ongoing immigration proceedings and that he had previously posted bond to be released from detention.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

24. Instead of verifying Mr. Luna's assertions, the officer accused Mr. Luna of fabricating his entire story and of possession of false Washington state identification. The officer requested that Mr. Luna sign a form consenting to be deported. Mr. Luna refused.

25. Mr. Luna was then placed in a holding room along with many other detainees.

26. While in detention, Mr. Luna was not allowed to place a single phone call. Despite his requests, officers did not permit him to contact his immigration attorney nor any other legal counsel. CBP officers repeatedly removed him from the holding room and attempted to force him to sign a form facilitating his own deportation. The officers told Mr. Luna he had a prior removal order, and falsely represented that they had no record of his ongoing withholding of removal proceedings and that he had no right to any further judicial hearings before his deportation. Mr. Luna resisted these attempts, repeatedly informing the CBP agents that he was in removal proceedings.

27. At some point during his detention, Mr. Luna spoke to a different immigration officer via a computer. Mr. Luna again explained he could not be deported because he was involved in ongoing immigration proceedings and requesting protection in the United States. Like his colleagues, this immigration officer ignored Mr. Luna's pleas.

28. CBP agents also degraded and menaced Mr. Luna and his fellow detainees. Mr. Luna was threatened with physical harm if he did not obey orders. One officer claimed he could "do whatever he want[ed]" if Mr. Luna did not abide by CBP agents' orders.

29. After at least two days of detention, Mr. Luna was sequestered in a room with other detainees who had also insisted on seeing judges. Mr. Luna had asked to see a judge, believing that an impartial official would actually listen to his assertions regarding his immigration status. A CBP officer entered the room, approached Mr. Luna, and asked him again to sign a form. Mr.

COMPLAINT – 5
Case No. 2:20-cv-1152

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Luna could not proficiently read English, so he instead asked the officer if signing the form would enable him to see a judge. The officer responded affirmatively, "Sure, just sign."

30.   CBP agents did not permit Mr. Luna to see a judge. Mr. Luna surmised the officer deceived him in order to secure the signed form. Several hours after signing the paper, Mr. Luna was deported to Mexico.

31.   The papers documenting his ongoing immigration proceedings were returned to him right before he was deported.

32.   As a last resort, Mr. Luna pleaded with the officers overseeing his deportation to examine his papers and his Washington ID. The overseeing officers told Mr. Luna that his upcoming immigration hearing had been "cancelled." This was not true—his hearing was still scheduled for June 2017 in Seattle, Washington.

33.   Before deporting him, CBP agents again seized Mr. Luna's documents showing that he was in removal proceedings. They then then forcibly removed him to Mexico.

34.   During Mr. Luna's time in detention, CBP agents had custody of Mr. Luna's immigration paperwork, demonstrating that he was in pending removal proceedings before the immigration court in Seattle. Moreover, this information was readily available on multiple government databases to which CBP has immediate access. That information showed that Mr. Luna was currently in removal proceedings, did not have a final order of removal, and that he had previously posted bond to be released from detention. CBP nevertheless ignored this information and falsely asserted that Mr. Luna had no right to see a judge or continue his removal proceedings.

**Consequences of Unlawful Arrest and Deportation**

35.   When Mr. Luna was unlawfully deported to Mexico in October 2016, his fears regarding his return materialized. He contacted his brother-in-law, Fernando, to pick him up

COMPLAINT – 6
Case No. 2:20-cv-1152

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

from Monterrey, Mexico. Fernando lived with Mr. Luna's sister in Zacatecas, Mexico. Mr. Luna told no one but Fernando of his location.

36.    The following day, instead of meeting Fernando, Mr. Luna was surprised by two trucks filled with armed men. Mr. Luna could not be sure these men were targeting him specifically, but he believes they were connected to the drug-trafficking organization that had caused him to flee Mexico in the first instance. Because he saw the trucks heading towards the house where he was staying, he was able to narrowly escape. He then made his own way to Zacatecas.

37.    Upon arriving in Zacatecas, he learned that Fernando had been brutally murdered. Mr. Luna believes that Fernando spoke with Mr. Luna's brother, Santos, about Mr. Luna's return to Mexico. Mr. Luna suspects Santos of working with a drug-trafficking organization.

38.    Further, Santos has repeatedly intimated that he might harm Mr. Luna. He has sent Mr. Luna a photo of himself with an assault rifle, a weapon commonly used by drug-trafficking organizations in Mexico. Mr. Luna consequently believes that the drug-trafficking organization with which Santos is involved tortured and killed Fernando in order to ascertain Mr. Luna's location. Fernando's body displayed indications that his fingernails were pulled off while he was still alive, and that he was then he was killed with a shot to the head. Mr. Luna does not believe Fernando was involved in organized crime.

39.    As a result of his brother-in-law's execution, Mr. Luna fled into the mountains. He lived in a cave, leaving only to obtain provisions and make contact with his immigration attorney. He experienced severe anxiety during this period, as he knew the cartel was searching for him. Mr. Luna even contemplated suicide.

COMPLAINT – 7
Case No. 2:20-cv-1152

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

40.    Mr. Luna contacted his immigration attorney as soon as he arrived in Mexico. Despite his attorney's repeated demands to DHS that they facilitate Mr. Luna's return to the United States, the agency did not finish arranging Mr. Luna's return for more than two months.

41.    In mid-January 2017, after repeated attempts by his attorney to facilitate his return, CBP eventually agreed to allow Mr. Luna to be paroled into the country after he presented himself at the U.S.-Mexico border.

**Emotional and Financial Harm Suffered as a Result of Unlawful Arrest and Deportation**

42.    Mr. Luna experienced severe fear, trauma, and stress while fighting his wrongful detention and removal. He also experienced life-threatening danger upon being unlawfully deported. These feelings exacerbated Mr. Luna's pre-existing post-traumatic stress symptoms, depression, and anxiety.

43.    This emotional trauma was reasonably foreseeable. Mr. Luna had already demonstrated there was a "significant possibility" that it was "more likely than not" he would be tortured or persecuted in Mexico if deported. 8 C.F.R. § 208.30(e)(2) (establishing "significant possibility" standard); *see also id.* § 208.16(b) (explaining standard for obtaining withholding of removal).

44.    Further, Mr. Luna's unlawful deportation caused him to be separated from his young son, whom he tries to see every couple of weeks.

45.    Mr. Luna additionally experienced direct, tangible financial harm as a result of his unlawful arrest and deportation. He was unable to pay rent for his apartment while he was in hiding in Mexico. As a result, he lost possession of his apartment and all his belongings within it. The latter were discarded when another tenant replaced him.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

46.    In short, Mr. Luna was deprived of his freedom, put in jeopardy of foreseeable violence, separated from his family, stripped of his possessions, and personally traumatized and degraded. He continues to suffer psychological harm as a result.

### CLAIMS FOR RELIEF

### Count I
### Federal Torts Claims Act - False Arrest & False Imprisonment

47.    All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

48.    Under Texas law, a government officer commits the tort of false arrest and false imprisonment when they (1) willfully detain someone, (2) detain that individual without the detainee's consent, and (3) detain the person without authority of law. *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 376 (Tex. 1985); *see also Villegas v. Griffin Indus.*, 975 S.W.2d 745, 754 (Tex. Ct. App. 1998) (false arrest and imprisonment have same elements under Texas law).

49.    CBP agents may briefly detain someone when agents have a reasonable suspicion that an individual "is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2).

50.    CBP agents may arrest someone where they have probable cause "to believe that the person to be arrested has committed an offense against the United States or is a [noncitizen] illegally in the United States." 8 C.F.R. § 287.8(c)(2).

51.    The CBP agents who arrested Mr. Luna lacked probable cause. Mr. Luna presented a valid Washington State identification and a document demonstrating that he was in removal proceedings. DHS records also reflected that Mr. Luna had been released on bond. As a result, the agency lacked legal authority to detain Mr. Luna.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

52.     DHS may revoke a noncitizen's bond only where there "has been a substantial violation of the stipulated conditions." 8 C.F.R. § 103.6(e); *see also* 8 U.S.C. § 1226(b). DHS arrested and deported Mr. Luna without revoking the bond set by the immigration judge, and without any "substantial violation of the stipulated conditions" of that bond.

53.     As a result, CBP's arrest and detention was done without lawful authority. Mr. Luna's attempts to explain that he was in removal proceedings also demonstrate that CBP agents detained Mr. Luna absent his consent.

54.     CBP agents have no authority to effectuate the removal of a noncitizen who is in proceedings to determine whether they are entitled to withholding of removal or protection under the Convention Against Torture. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16, 208.17, 208.31. Because Mr. Luna was in withholding of removal proceedings, his removal was unlawful.

55.     By deporting Mr. Luna, CBP agents willfully detained him and prevented his reentry to the United States. They therefore willfully restrained Mr. Luna's movements without his consent, and did so in violation of the INA.

56.     Mr. Luna suffered significant harm because of this false arrest and imprisonment, including but not limited to loss of liberty, humiliation, fear, trauma, stress, disruption of his daily life, economic loss, and other damages.

57.     Accordingly, the United States is liable for Mr. Luna's wrongful arrest and deportation under the FTCA.

### Count II
### Federal Torts Claims Act – Abuse of Process

58.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

59.     Under Texas law, the elements of an abuse of process claim include (1) an illegal, improper, or perverted use of the process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damage as a result of the illegal act. *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. Ct. App. 2018).

60.     CBP arrested, imprisoned, and deported Mr. Luna without lawful authority.

61.     Instead of correcting this unlawful action, CBP agents misused their authority and the removal process to coerce Mr. Luna into signing paperwork that facilitated his deportation.

62.     CBP agents undertook this coercion by repeatedly pressuring Mr. Luna to sign forms consenting to deportation, unlawfully detaining him, denying him access to counsel, verbally disparaging and threatening him, and ultimately deceiving him about whether he would be permitted to see an immigration judge by signing the deportation form.

63.     These agents acted with the improper purpose of legitimizing CBP's unlawful arrest, imprisonment, and deportation of Mr. Luna.

64.     Mr. Luna suffered harm, including but not limited to loss of liberty, humiliation, fear, trauma, stress, disruption of his daily life, economic loss, and other damages.

65.     Defendant United States of America is liable for these acts and omissions under the FTCA.

### Count III
### Federal Torts Claims Act – Intentional Infliction of Emotional Distress

66.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

67.     Under Texas law, a claim for intentional infliction of emotional distress lies where "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1 distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.

2 1993) (citation omitted).

3     68.    The CBP agents who arrested, processed, detained, and removed Mr. Luna acted in

4 reckless disregard of his pending withholding of removal proceedings.

5     69.    These CBP agents' conduct was both extreme and outrageous. Mr. Luna insisted that

6 he was in removal proceedings, had records on his person documenting his ongoing proceedings,

7 and moreover, agency records demonstrate that CBP agents viewed and had at their disposal

8 information confirming this fact.

9     70.    CBP's actions caused Mr. Luna severe emotional distress because of the fear he faced

10 prior to removal and the extreme danger he faced following his removal. While wrongfully

11 detained, Mr. Luna experienced desperation and humiliation, as officers repeatedly ignored his

12 pleas for release. Further, officers ridiculed and intimidated Mr. Luna, demoralizing him by

13 refusing to investigate his pending proceedings and the custody determination releasing him on

14 bond.

15     71.    Mr. Luna also experienced protracted anguish and emotional trauma during his time

16 in Mexico, much of which he spent in hiding. Mr. Luna's brother-in-law was tortured and

17 murdered while Mr. Luna was in Mexico. Mr. Luna narrowly escaped a threat to his own life.

18     72.    Prior to Mr. Luna's unlawful removal, he suffered from post-traumatic stress

19 disorder. The extreme fear, desperation, and anxiety led Mr. Luna experienced because of CBP's

20 actions led him to contemplate suicide following his unlawful removal to Mexico and

21 exacerbated his post-traumatic stress disorder symptoms.

22     73.    DHS's lack of urgency in facilitating Mr. Luna's readmission to the United States—

23 notwithstanding the fact that Mr. Luna was unlawfully removed—compounded Mr. Luna's

24 emotional trauma.

COMPLAINT – 12
Case No. 2:20-cv-1152

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

74.   Defendant United States of America is liable for these acts and omissions under the FTCA.

**Count IV**
**Federal Torts Claims Act – Negligence**

75.   All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

76.   Under Texas law, a claim for negligence lies where a person owe a legal duty to another, breaches their duty, and the breach of duty is the direct and proximate cause of injury resulting in damages.

77.   The CBP agents who arrested Mr. Luna owed a legal duty to Mr. Luna, breached their duty, and, as such, were a direct and proximate cause of harm and a substantial factor in bringing about Mr. Luna's damages outlined above.

78.   In particular, during the arrest and subsequent detention and removal process, the CBP agents referenced above violated their duty to Mr. Luna by, inter alia, failing to verify whether Mr. Lune was in fact already in removal proceedings seeking protection from removal as he claimed and by failing to verify whether he had already been ordered released by an immigration judge upon posting a bond.

79.   Defendant United States of America is liable for these acts and omissions under the FTCA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief as follows:

a.   Trial by judge on all claims so triable.

b.   Compensatory damages in an amount to be proven at trial.

c.   Costs and reasonable attorneys' fees.

COMPLAINT – 13
Case No. 2:20-cv-1152

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1       d.   The right to conform the pleadings to the proof and evidence presented at trial.

2       e.   Such other relief as the Court deems equitable.

3    DATED this 28th day of July, 2020.

4            s/ Matt Adams
             Matt Adams
5            matt@nwirp.org

6            s/ Aaron Korthuis
             Aaron Korthuis
7            aaron@nwirp.org

8            NORTHWEST IMMIGRANT RIGHTS PROJECT
             615 Second Avenue, Suite 400
9            Seattle, WA  98104
             Telephone: (206) 957-8611
10           Facsimile: (206) 587-4025

COMPLAINT – 14
Case No. 2:20-cv-1152

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611